Good morning. Good morning, Your Honors. I am Helena S. Wise and I am pairing on behalf of James Osburn and Elizabeth Alvarez. Do you want to reserve any time for rebuttal? Absolutely. I would like to reserve five minutes. Thank you. We are here in a very unusual situation in that there was a first summary judgment motion that was heard wherein the court stated that he felt there was sufficient evidence to proceed to trial on behalf of the Section 101A2 claims that were brought by Ms. Alvarez and Mr. Osburn raising the issues of their rights under the Labor Management Reporting Disclosure Act having been violated. In that decision he then had indicated that he felt the trusteeship that was imposed upon the Hollywood Sound Union was not patently unreasonable but that notwithstanding that he still felt that there were Title I rights that had been violated and he then indicated that he did not believe the rights under 609 of the Act were infringed upon. At least as of that point in time, as of the summer of 2016, we were proceeding to a trial on one issue which had to do with the importance of the Labor Management Reporting Disclosure Act. I have a question. Do the appellants have multiple claims for violations of Section 101A2 and 609 of the LMRDA or do they assert a single claim of unlawful retaliation for exercising member rights granted by the LMRDA? We have a single claim that's brought under Title I with separate claims that are brought for violation of due process and bias issues that implicate Section 609 as well. In regards to that, we have alleged that there's a violation of 101A2 which has to do with speech in assembly. We also allege a violation of 101A5 which has to do with the violation of the due process rights of the members. Those two issues segue into the second issue which is based upon the constitution and bylaws of not only the international but obviously the United States as well. You have certain principles of due process that have to be met that in this particular case were never satisfied. We have an international president who has a constitutional... I'm looking for the answer to the same question Judge Callahan has posed. I'm trying to figure out exactly what the statutory basis for each claim is and you've now moved into the due process claims. I'm still focusing now on what I'll call retaliation although that term is not used in the statute. Is there more than one statutory basis for what I've called the retaliation claim and if so what is it? Absolutely. It's Section 101 which talks about equal rights and that you cannot, even though I respectfully disagree, you cannot retaliate against a person for exercising their LMRDA rights which is under 101 of the Act. In addition to that when you get to Section 609 of the Act it also talks about you cannot retaliate against an individual who is a member for exercising their rights. In this particular case it's a two-prong violation and the court said yes you have a 101 but you don't have a 609 and I respectfully disagree because we've presented to the court what happened to Mr. Osborne, a gentleman who should be receiving his 50-year pin, not even getting his 50-year pin because he was suspended from membership for one year and as a consequence even though he had been re-elected and he's one of the few individuals in the IATSE who had been re-elected unanimously by his membership repeatedly for defending the Hollywood Sound Union, defending their jurisdiction and defending the right of members of the Hollywood Sound Union to work outside of the state of California, across the United States and across the world and because of his dissent and the dissent of Ms. Alvarez, what happened is the international president came in here and said after conducting a trusteeship hearing that was not specific, it only dealt with one issue, he then filed charges against Mr. Osborne to remove him from office and then he realized that the trusteeship decision which had not yet even issued, that was not fact specific, was insufficient. So the international president himself then added to the charges and he then said well you didn't do this in the case involving Kate Jesse, you didn't do this involving the case of Mark Webber and the Mark Webber cases as the court is aware is a situation where way back in 2008, the boom man and his mixer, in this case Mark Webber the mixer, went to Louisiana, had worked on a show from Hollywood under the basic agreement and found a producer on Bad Lieutenant who wanted to hire them again but the Louisiana local said no. So I understand all of that but okay, is there any genuine dispute that Mr. Osborne encouraged members of the local 695 not to pay work assessments to other locals and if so, what evidence in the record creates a genuine dispute about this fact? And I'm just going to sort of ask that if there's no genuine dispute, why doesn't that entitle, do we call it IATSE or what do we call it? We call it IA, we call it international or IATSE or IATSE. Okay, so if there's no genuine dispute, why doesn't that entitle IATSE to summary judgment as to the suspension of Mr. Osborne's membership? Because there is a genuine dispute and the dispute had to do with Josh Levy where the court said that based upon the evidence involving the testimony of Josh Levy, there was an issue that could be decided one way or the other. But in this particular case, there was Kate Jesse. He was not... Is there a dispute that he encouraged local 695 not to pay work assessments? Is there a dispute as to that? There is a dispute. He did not tell Josh Levy not to pay them. He said, let me get an invoice. This is the same issue of, because if you look at 101, 101.3 says you can only have fees and assessments that are approved by the members. And we know that there has been an additional record that has presented about what did or did not happen at the appeals hearing, but attached to our response in that ancillary record is a statement from Chandra Miller in Louisiana who said, now, after she has been tossed out, while I was the secretary treasurer, we were treating people differently. We were ripping up invoices for some. We were charging others. And we were not uniform in what we were doing, which is precisely why Mr. Osborne and Ms. Alvarez said, give us an invoice. Show us what there is. And International President Loeb, in the case involving Kate Jesse back in 2009, involving Arizona where he said first, although ultimately he sends her a letter and says, don't play games. Six months before when Mr. Osborne says, where is the invoice? They won't give us a dollar amount as to what she owes. International President Loeb said, you're right. Give an invoice. And that invoice issued and Ms. Jesse immediately paid. The local, after being told to give the invoice, felt it didn't have to do that anymore. So six months later, similar situation. The local in Louisiana said, you have to sign a dues checkoff form, which is almost the issue in Janus that was just before the United States Supreme Court. They said, you have to file this dues checkoff. And she says, I'm not obligated to sign a dues checkoff. You can have your dues. Just tell me how much I'm owed. But let me explain to you why there would be a reason to ask for an invoice. Individuals in the sound union come in with their box rentals and different equipment. They come in with their mixing boards. They come in with their microphones and all the different assortment of items for which producers pay them a box rental. That's not a salary. So what some of these locals were doing is saying, oh, we want fees and assessments based upon not just your salary, upon all your box rentals, upon any additional per diem we're going to get. And Mr. Osborne said, tell us what the invoice is. I'm sorry about this, but my hearing might not be perfect, but I can hear you really well. Sorry. I've been accused since high school of always forgetting where the acoustics are. So in that particular situation, he said, give us an invoice. When the invoice was given, Kate Jesse paid. Mr. Hansen paid. But let me ask you this. Let's say, I'm just saying this hypothetically. If I were to include, if I were to conclude that there is no genuine dispute that Mr. Osborne encouraged members not to pay work assessments, does that, does the other side win then? Absolutely not. Because the court had indicated the issue is whether or not there was retaliation for the dissent that Mr. Osborne and Ms. Alvarez had expressed. Based upon the overwhelming X records. Let's just say, but let's say you, you know, you commit a crime or you, you know, you violate the Constitution or whatever. The fact that you also don't like it, does that First Amendment, does that trump in that you actually violated a part of what the rules are? Is that always, because obviously, you know, then you could always say, well, yeah, I violated the rules, but I violated them because I don't like them. So then, is there a retaliation always? Because that's what I'm trying to. No, in this particular situation, I know under various issues about the First Amendment, there's a concern where you can say, oh, there's always an exception to the First Amendment rights. I understand that, but what we are dealing with is a situation that's very explicit, that talks about when you can charge individuals and the right of the union in order to uphold what Congress passed. The right to insist that the fees and assessments be approved by the membership. Asking, if, if it weren't for the fact that Article 7 of the Constitution says the international president can give a directive. He has to give a directive that places Mr. Osborne, Ms. Alvarez, the entire board of directors on notice that says, stop this. We don't want you asking anymore. You're down to three minutes. Do you want to save time? I have requested that I'd be allowed to save an additional five. Yes. I understand. No harm in asking. Okay. Thank you. Thanks. Good morning. Good morning, Your Honors. May it please the Court. I'm Liesl Soto, appearing on behalf of Respondents, International Alliance of Theatrical Stage Employees, the International, or IATSE for short, and its duly elected president, Matthew Loeb. The trusteeship imposed by the International Union on Local 695 in February 2014 was entirely lawful. Appellants have abandoned any claim to the contrary. When we look at the issues that they've presented to this Court, there is no claim challenging the District Court's determination that the trusteeship was done lawfully. Well, okay, but in Mr. Loeb's deposition, okay, now that we've established that it's an easy case for both of you, let's focus on it might be a harder case for us, or in any way I can speak for myself, that in Mr. Loeb's definition he agreed that except for the plaintiffs and two other individuals, all other employees were returned to work at Local 695. Why doesn't that create an issue of fact about the Union's motives as to the plaintiffs? That is, the testimony quoted from President Loeb's deposition I think is a little bit misleading in the way that it's quoted. Council asked in his deposition whether or not all the rest of the officers were returned to an advisory board. President Loeb answered, there was no advisory board. And then she went on to ask him, but weren't all of the other officers asked to return? And he said, they may have been asked for advice, but there was no advisory board. I don't know the exact details. She also asked President Ulano of Local 695 regarding the advisory board issue. His testimony regarding that matter... It's not just about advisory board. I mean, looks like it's Mr. Loeb who's asked, is it correct except for Alvarez, Strupke, Osborne, and Keyes, all other employees returned to work at Local 695 and you make an objection? And the witness says yes. Your Honor, there is a distinct difference between the employees of the Local and the elected officers that were serving on the board. All of the elected officers were removed pursuant to the trusteeship, part and parcel with the trusteeship. In addition, the local had employees, some of which were also officers. But when the question is about employees, it's a different answer to a different question. But it sounds like everybody else was allowed to come back in some fashion. And the earlier testimony doesn't really limit itself to advisory board. I mean, how can we say based on this record there's not a dispute of fact with regard to whether these individuals are treated differently than other individuals? I would ask Your Honor to review the record at 3494 to 3496, which is the testimony of President Ulano of Local 695, who was there on the ground actually participating. President Loeb was not one of the appointed trustees. He was not involved in the day-to-day. Do you want us to resolve an issue of fact on summary judgment? No, Your Honor, but it goes to the fact that the way that appellants characterize Loeb's deposition testimony is inaccurate. It is an attempt to create a dispute of fact where there is none. The trusteeship caused the removal of all elected officers as a requirement of the trusteeship. That's what occurs in a trusteeship. To require the suspension of Osborne from membership? With regard to Osborne's suspension... Answer that question first. Did imposing a trusteeship require the suspension from membership of anybody? No, Your Honor. Okay. With regard to that issue, I would first make the point that appellants have waived that question. They do not present as an issue to this Court whether or not Osborne's suspension from membership violates 101A2. Their third issue refers to the due process concern under 101A5. But they do not raise a claim that his suspension violated 101A2. But with regard to the suspension, the LMRDA does give a right to free speech and assembly over matters of union concern. But the second provision of that law also balances that right with the right of the union to enforce reasonable rules, to protect the integrity of the union, to place responsibilities on the members of that union, to comply with those reasonable rules, to allow the union... But it is alleged that the whole reason for the suspension was to make him ineligible to be... to stand for election when the trusteeship was ended and new officers were elected. That's the allegation. This makes it all part of the same package. I'm not hearing from you an answer that kind of satisfies my concern about that allegation. The record reflects that the International brought charges against Osborne with regard to his membership because there was direct evidence that he willfully disregarded the International Constitution, Section 19, Article 19, Section 26 work assessments. They had direct evidence to that effect. Was it disputed, though? Did he dispute it? In the hearing, there is no direct evidence that he disputed it, but either way, under International Brotherhood of Boilermakers v. Hardeman, Local 1052 v. L.A. District Council of Carpenters, which is a case decided by this court, neither this court nor the district court sits in place of the tribunal that's been appointed by the union based on its reasonable rules. The union's interpretation of its reasonable rules, including appointing a hearing officer and having a hearing to decide the merits of such an issue, the court is required to give deference and to allow the union to interpret its Constitution in a reasonable way, absent bad faith or any other sort of showing of unconscionability. So anytime they have a hearing, then you always are entitled to summary judgment because you got it right? That's not accurate, Your Honor. No, that's what I heard you say. If there's a showing of bad faith, and bad faith means that the international officers acted in a way that's contrary to the union's self-interest, then in those circumstances, the district court could look further and not provide deference to the union's interpretation of its reasonable rules. But there has been no showing of bad faith here. And Boilermakers v. Hardeman states that, yes, members are afforded a full and fair hearing, but the international, the union only need provide, quote, some evidence in order to be able to pursue such charges. So not only have appellants waived a 101A2 claim as to Osborne's suspension, but there is nothing in the record that provides any factual basis for a causal connection between his claimed protected activity and the suspension, particularly where the tribunals, based on direct evidence, found that he deliberately violated the international's constitution. So how long was the trusteeship in place, and how were officers of Local 695 put in place after the trusteeship ended? And can you please point to the evidence that's in the record on that issue? The trusteeship went from February of 2014 to January 2015, and there was a Democratic election held, and members in good standing of Local 695 were made aware of the fact the election was going to take place, and they were allowed to vote in that election. With regard to the... Be it not for Mr. Osborne. Mr. Osborne was not permitted to vote if it was during the year that he was suspended for one year, yes. He was not permitted to stand for office, so other members could not vote for him. That is correct. What about the woman in this case? She also lost her employment besides her being an officer, is that correct? Correct. Under Finnegan v. Liu, her employment status is subject to a different standard, and it was permitted for the local to... I'm sorry, for the trusteeship to sever her employment under Finnegan v. Liu. She has never suffered... If she was exercising her rights under 101A2, can you still do it? Under Finnegan v. Liu, and it provides, also under sheet metal workers, it provides that 101A2 protects the right to members, for a member to have the right to free speech, but it doesn't similarly protect employees or appointed members of the union, because that doesn't serve the purpose of a democratically elected leader to be able to choose the employees or the appointed individuals. So why didn't you get rid of her, because she was poisoning the well, or we want to get her out of there, or what? Why do we want to get her out of there? The trustees stated that they were concerned about her ability to continue representing the members and to not be distracted by the situation with Osborne, as they have a very close, intimate relationship. The site for the trusteeship being lifted is in the MSJ order at 45, and also described in 3751. Ms. Alvarez's status as a member has never been affected. At no time has it been affected. The only thing that occurred with respect to her is that her employment was separated. Again, under Finnegan v. Liu, it's a different standard. The importance, I think, of Article 19, Section 26 work assessments cannot be understated. As a matter of principle, the international president and the international union have to uphold the Constitution and apply it fairly. But with respect to the work assessments, the purpose behind those work assessments are to protect areas of the country where there might not be as much work as, for example, here in Hollywood. If a member of the Hollywood local, Local 695, is overworking on a production in the jurisdiction of another local, take 478, for example, who has jurisdiction in Louisiana, southern Mississippi, and Mobile, Alabama. If a Local 695 member is performing work in that area, based on the work assessment provision in the Constitution, that member pays work assessments to Local 478. And that's because Local 478 is representing that individual during that time frame. They may be filing a grievance on behalf of the worker. They're continuing to service and enforce the collective bargaining agreement with the employer covering that area. And they're expected to continue to maintain that collective bargaining agreement for that area. And it goes without saying that if a Hollywood member is working in southern Mississippi, more than likely a southern Mississippi employee has been displaced. But for the work assessment provision of the Constitution, Local 478 would not be receiving income in order to be able to service members during that time frame. Well, if there's a tribal issue of fact as to whether he told people not to pay, which the appellant claims there was, if he was just saying, I don't think you have to pay. Let me look at an invoice or whatever. If there's a tribal issue on that, then do we have to reverse the summary judgment? No, Your Honor. There is no tribal issue as to that fact. But more importantly, the second element of their claim... No, I asked you on a hypothesis. If there is in fact... The response wasn't, no, there's not a tribal issue. The fact was, if there is a tribal issue, then does summary judgment have to be reversed on that? I apologize. No, the answer to your question is still no because the second element of their claim requires a nexus. It requires but for. It requires a causal connection between their claimed protected activity and the action taken. And in this circumstance, they have provided no evidence to establish a causal connection, particularly where they violated the international constitution providing grounds. Well, okay. But if there is a tribal issue about if they were advocating for a change in paying those dues as opposed to telling people not to pay the dues... No, because... You don't win then. I don't see how you can win then if that... Under the LMRDA, a union can discipline, as a matter of law, a union can discipline a union member for violating the union's reasonable rule. Okay. But if they're not telling people don't pay the dues, then what rule have they violated? If they're just saying I think there should be a change, let's see about getting a change. What rules violated them? They can't talk about that? I believe that the precedent I cited earlier with regard to Boilermakers versus Hardeman and Local 1052 versus LA District Council of Carpenters establish that this court nor the district court evaluates the facts heard pursuant to the union's reasonable interpretation of its constitution. Well, what could be a violation then from what you're saying is if everything they say, if you interpret that as a violation of your constitution, that's the end of the story. Your Honor, if the court... What right do you have to say anything? If the court finds bad faith, there are specific exceptions, bad faith. If the court identifies bad faith, which is defined in Teamsters that there's evidence that the union officials are acting contrary to the union's best interest. If the court identifies bad faith, then the court will not necessarily defer to the decisions of the union officials. But I guess what I'm asking you, if a person is just saying I think a rule should be changed, is that a violation of the constitution? No, Your Honor. Okay. Thank you. Thank you. Just to go back to the last issue about the dues again, Mr. Osborne and Ms. Alvarez told people you have a dues obligation. We want an invoice. The language of Chandra Miller, the individual who was involved in the Louisiana local, this is at ACER 28, specifically said, here's what I witnessed on almost a weekly basis. Data being manipulated in the membership database. Invoices being voided or certain members being handpicked to not be invoiced at all. Non-actions being taken allowing certain people to work out of their home jurisdiction without having to pay their fair share of work dues. Reinstatement procedures and fees being waived for a select few. While other members were being scorned for doing the same. She was the secretary-treasurer of the Louisiana local. And I submit that shows precisely why Mr. Osborne said, give us an invoice. Are you charging this person for working? Are you increasing it because of their box rentals or what? And President Loeb when addressing that situation in 2009 involving Kate Jussie said, yes, give an invoice. He never issued a directive after that saying, Mr. Osborne and Ms. Alvarez, you're wrong, stop. You don't have a right to ask anymore. So I submit to you since we even had members in Texas who were being dealt with in Louisiana in an unfair manner that Mr. Osborne and Ms. Alvarez were correct in their assumptions as to what they were requesting. Council has certainly raised the local 1052 decision. I submit on this record there's bad faith. There's ample bad faith here. One, especially since Mr. Loeb admitted this is the Constitution and bylaws and it says there has to be a fair hearing but he ignored the fair hearing because the fair hearing had to be in front of the local union that was still in effect. President Loeb said, well, the reason why I filed charges against Mr. Osborne was there was no local so I'm relying under my powers under Article VII but when we quoted his deposition in the record he specifically said as of the date I filed the charges there was a local union and I knew the person under this Constitution I had to serve was Ms. Alvarez but you know what? When the matter was ultimately heard against Mr. Osborne there was no longer a local union because I imposed a trusteeship. Well, that's precisely why the decision in Wildberger is very appropriate because in this particular case it says that in the situation of Loeb he acted as the accuser, the prosecutor, the grand jury, the judge, the jury to get rid of Mr. Osborne and to get rid of Ms. Alvarez. In this particular situation if you look merely at the headings in the briefs we've certainly talked about not only their rights as Title I as elected officials but more importantly as members of the union far beyond simply being advisory members because that occurred and I would simply like as a final note to state it's been an honor representing for the 35 years previously the sound union but more importantly a man of conscious and intellectual discipline that was Mr. Osborne and Ms. Alvarez who were there to represent their members and the fact that Mr. Loeb took them out is outrageous. Please return this case. Thank you. Thank you. Thank you both for your argument. This matter will stand substituted.
judges: Clifton, Callahan, Hoyt